# United States Court of Appeals
## For the First Circuit

No. 24-1042

DOUGLAS HUMBERTO URIAS-ORELLANA;
SAYRA ILIANA GAMEZ-MEJIA; G.E.U.G.,

Petitioners,

v.

MERRICK B. GARLAND, United States Attorney General,

Respondent.

---

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

---

Before

Gelpí, Lynch, and Montecalvo,
Circuit Judges.

---

Kevin P. MacMurray and MacMurray and Associates, on brief for petitioners.

Brooke M. Maurer, Trial Attorney, Bryan M. Boynton, Principal Deputy Assistant Attorney General, and Nancy E. Friedman, Senior Litigation Counsel, Office of Immigration Litigation, U.S. Department of Justice, on brief for respondent.

---

November 14, 2024

---

**GELPÍ, Circuit Judge.** Petitioner Douglas Humberto Urias-Orellana ("Urias-Orellana") is a thirty-three-year-old native and citizen of El Salvador. He -- along with his wife, Sayra Iliana Gamez-Mejia ("Gamez-Mejia"), and their minor child, G.E.U.G. -- petition for review of a final order of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ," together with the BIA, "the Agency") denial of their requests for asylum. Urias-Orellana also petitions for review of the denial of his application for protection under the Convention Against Torture ("CAT").[1] The Agency premised its denials on several grounds, including that Petitioners did not meet their burden to (1) demonstrate harm rising to the level of persecution to qualify for asylum or withholding of removal, or (2) show that they could not reasonably relocate in El Salvador. As to CAT relief, Urias-Orellana did not show there was error in the factual finding that it is "[un]likel[y] [Urias-Orellana] will face torture by or with the consent or acquiescence (including willful

[1] Where necessary, we refer to the trio collectively as "Petitioners." Although Gamez-Mejia and G.E.U.G. can seek asylum as Urias-Orellana's derivative beneficiaries, they cannot assert derivative claims for CAT protection or withholding of removal. That is because those forms of relief do not carry derivative benefits, and Gamez-Mejia and G.E.U.G. did not file separate applications. See 8 C.F.R. § 1208.16(b), (c). The upshot is that our denials of Urias-Orellana's petitions for review of the asylum and withholding of removal determinations apply to their asylum application. Only Urias-Orellana brought a CAT claim. See Cabrera v. Garland, 100 F.4th 312, 315 n.1 (1st Cir. 2024).

blindness) of any public official or persona acting in an official capacity." We deny the petition for review.

## I. BACKGROUND

"We draw our background 'from the administrative record, including [Urias-Orellana's] testimony before the IJ, which the IJ found credible.'" Gonzalez-Arevalo v. Garland, 112 F.4th 1, 6 (1st Cir. 2024) (quoting Chun Mendez v. Garland, 96 F.4th 58, 61 (1st Cir. 2024)).

### A. Underlying Facts

On or about June 28, 2021, Petitioners entered the United States without authorization. The Department of Homeland Security ("DHS") served them on August 10 with Notices to Appear in immigration court. DHS charged Petitioners with removability for being present in the United States without being admitted or paroled, Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). Petitioners conceded proper service and admitted their removability. In so doing, Petitioners noted that they would seek asylum, while Urias-Orellana indicated that he would also seek protection under the CAT.[2]

[2] He also indicated his intent to seek withholding of removal. But Petitioners' brief is devoid of any argument mentioning withholding of removal. Accordingly, any challenge to the denial of withholding of removal has been waived. See Jimenez-Portillo v. Garland, 56 F.4th 162, 165 (1st Cir. 2022).

In his asylum application, Urias-Orellana explained that he feared harm because his half-brothers, Juan and Remberto, had been shot and severely injured, and he believed that similar harm would befall him and his family.

Urias-Orellana expanded on these concerns during his testimony before the IJ at a hearing on March 14, 2022, and through an affidavit filed in immigration court. Urias-Orellana, represented by counsel, explained that he feared persecution in El Salvador on the basis of his particular social group: Urias-Orellana's family. Specifically, Urias-Orellana feared returning to El Salvador because of Wilfredo, a "sicario" (which roughly translates to "hitman") for a local drug lord in El Salvador. Wilfredo's mother and the father of Urias-Orellana's half-brothers[3] were involved in a relationship of which Wilfredo did not approve. Around February 2016, Wilfredo's disapproval turned to violence when, after an argument with Juan at a cantina, he shot Juan six times. Juan suffered severe injuries from the shooting -- he is now wheelchair-bound -- and moved away to Cara Sucia (a forty-minute drive from where he was shot).

The shooting apparently did not placate Wilfredo's anger. So he vowed to kill Juan's entire family. He turned his crosshairs next on Remberto in August 2016. Wilfredo ambushed

[3] Juan and Remberto have the same mother as Urias-Orellana but a different father.

Remberto in a secluded alley, shooting him nine times. Remberto survived the encounter. Urias-Orellana feared for his and his family's safety, and they fled to Cojutepeque, El Salvador, where they remained in peace for about one year.

Believing the worst to be over, Petitioners moved in February or March 2017 to live with Gamez-Mejia's family to another town in El Salvador, Colonia Claudia Lara -- about a thirty-minute drive from Sonsonate, where Urias-Orellana used to live. But, according to Urias-Orellana, Wilfredo must have learned of this move because two masked men approached Urias-Orellana in Claudia Lara a few months after. They demanded money and, when Urias-Orellana refused, warned him that they would "leave [him] like" his half-brothers and possibly kill him if he did not cave to their demands.

About six months later, Urias-Orellana again was threatened at gunpoint by masked men in August 2017. They threatened to kill him if he did not pay up the next time that they saw him.[4]

Petitioners then moved, again within El Salvador, to Cara Sucia to stay with Juan. They lived there without any

[4] Urias-Orellana testified that he and his family moved to Cara Sucia after the threats in February or March 2017. He explained that he was not approached again after that incident. But his affidavit indicates that he was targeted in August 2017. The IJ also analyzed the August 2017 encounter. Accordingly, we shall consider the August 2017 encounter in our analysis.

harassment or complaints or threats for two-and-a-half years. In December 2020, Urias-Orellana and Gamez-Mejia returned to visit his family in Sonsonate, and while there, he was confronted by two masked men on a motorcycle demanding money. They threatened him, assaulted him by striking him three times in the chest, and warned him that they would kill him if he did not pay them.

Urias-Orellana and Gamez-Mejia returned to Cara Sucia thereafter. But, on their journey, Urias-Orellana noticed two men on a motorcycle -- whom he believed to be the same men who beat him -- following him to Cara Sucia. Fearful that Cara Sucia was unsafe, Petitioners took a taxi to San Salvador before ultimately returning to Claudia Lara.

Upon their return, Urias-Orellana noticed that the same men who assaulted him were patrolling Claudia Lara apparently in search for him. And, while shopping in Claudia Lara around February or March 2021, he overheard two men asking a store employee if there were any newcomers to the area and where they were located.

The IJ asked Urias-Orellana questions once he finished recounting this narrative. He asked if Urias-Orellana's mother had ever been harmed or mistreated while living in El Salvador. Urias-Orellana answered that she had not, besides a threat from individuals "from Guatemala." The IJ asked the same question about Urias-Orellana's siblings, who also lived in El Salvador. Neither

his sister nor his half-sister (nor his half-sister's children) were ever harmed or mistreated while in El Salvador. The IJ asked about Urias-Orellana's other siblings besides Juan and Remberto -- Jaime, Celina, Rosabel, and Elmer. Although Urias-Orellana explained that some unknown assailants had "grabbed" and placed Jaime "in a room for [three] hours" at some point, he did not recall any of his other siblings facing harm or harassment in El Salvador.

The IJ further asked Urias-Orellana if he had been able to live without being harmed or threatened when he moved to Cojutepeque and Claudia Lara. Urias-Orellana admitted that he had been.

**B. Procedural History**

The IJ denied the application after considering Urias-Orellana's testimony, the submissions in support of Petitioners' claims, and the entire record. We focus on the facets of the IJ's decision that are relevant to this petition for review.

First, the IJ concluded that Urias-Orellana's testimony was credible, and that the recounted harm did not rise to the level of past persecution. The IJ acknowledged the death threats and assault, and found that the death threats were not so menacing as to qualify as past persecution. Further, the December 2020 assault did not require Urias-Orellana to receive medical treatment, and so was not past persecution.

Beyond that, the IJ found that Petitioners did not meet their burden to show that a reasonable person would fear returning to El Salvador. The IJ so concluded, reasoning (1) Urias-Orellana's relatives lived throughout El Salvador without suffering any harm or mistreatment at Wilfredo's hands, and (2) Petitioners were able to successfully relocate in El Salvador without facing any harassment or mistreatment. Indeed, the IJ noted, Urias-Orellana only encountered danger after he returned to his hometown.

Third, the IJ found that Urias-Orellana's CAT claim failed. The IJ noted that Urias-Orellana neither reported his harassment to the police nor demonstrated that doing so would be futile. The IJ acknowledged that a 2020 U.S. Department of State Country Conditions Report for El Salvador "present[ed] a mixed picture" on the country's efforts to combat organized crime. That mixed picture included the limited resources available to and corruption in the Salvadoran police and judiciary. The IJ also noted that the Report stated that the police had developed new techniques to combat gang violence and made efforts to root out corruption in the police force. The IJ concluded it would not be futile for Urias-Orellana to report any threats to the authorities, and he had not shown that, if there were further harassment, the Salvadoran government would acquiesce to it.

Petitioners appealed to the BIA, attacking the IJ's finding that the Petitioners had not shown that they (1) faced past persecution due to the threats and December 20 assault; or (2) had a well-founded fear of future persecution due to internal relocation and unharmed family members. Petitioners also appealed the IJ's finding that Urias-Orellana had not shown he qualified for CAT relief.

The BIA affirmed. It adopted the IJ's reasoning and added its views as to the denials of Petitioners' asylum claim and Urias-Orellana's CAT claim. The BIA agreed with the IJ that the threats and assault did not amount to persecution. And, after recognizing that Petitioners' failure to prove past persecution meant that they bore the burden of showing that relocation would be unreasonable, the BIA concluded that Petitioners had not met this burden. Moreover, the BIA noted that Urias-Orellana's mother and sisters were never threatened or harmed in El Salvador, and that Jaime was held by someone unaffiliated with Wilfredo. Finally, the BIA noted, inter alia, as to Urias-Orellana's CAT claim, that he never attempted to report his mistreatment to the police -- and that it would not have been futile to do so, in light of the country conditions evidence.

This timely petition for judicial review, over which we have jurisdiction, followed. 8 U.S.C. § 1252(a)(1).

## II. DISCUSSION

### A. Legal Standards

"Where, as here, 'the BIA adopts and affirms an IJ's decision, we review the IJ's decision "to the extent of the adoption, and the BIA's decision as to [any] additional ground."'" López-Pérez v. Garland, 26 F.4th 104, 110 (1st Cir. 2022) (alteration in original) (quoting Sunoto v. Gonzales, 504 F.3d 56, 59-60 (1st Cir. 2007)).

"We review the [A]gency's legal conclusion de novo. But we review its factual findings under the substantial evidence standard." Gonzalez-Arevalo, 112 F.4th at 8 (citation omitted). Under this standard, we must "accept the findings 'as long as they are supported by reasonable, substantial and probative evidence on the record considered as a whole.'" Gomez-Abrego v. Garland, 26 F.4th 39, 45 (1st Cir. 2022) (quoting Aguilar-De Guillen v. Sessions, 902 F.3d 28, 32 (1st Cir. 2018)). Thus, "we will only disturb the [A]gency's findings if, in reviewing the record as a whole, 'any reasonable adjudicator would be compelled to conclude to the contrary.'" Gonzalez-Arevalo, 112 F.4th at 8 (quoting Barnica-Lopez v. Garland, 59 F.4th 520, 527 (1st Cir. 2023)). "That the record supports a conclusion contrary to that reached by the [Agency] is not enough to warrant upsetting the [Agency's] view of the matter; for that to occur, the record must compel the contrary conclusion." Santos Garcia v. Garland, 67 F.4th 455,

460-61 (1st Cir. 2023) (quoting Hincapie v. Gonzales, 494 F.3d 213, 218 (1st Cir. 2007)). It is through this lens that we consider Petitioners' asylum claim and Urias-Orellana's CAT claim.

The INA requires a petitioner for asylum to prove that he is a "refugee," meaning someone "who is unable or unwilling to return to" his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). "Persecution in this sense 'requires proof of a "certain level of serious harm (whether past or anticipated), a sufficient nexus between that harm and government action or inaction, and a causal connection to one of those statutorily protected grounds."'" Gonzalez-Arevalo, 112 F.4th at 8 (quoting Barnica-Lopez, 59 F.4th at 527). If a petitioner fails to meet any of these requirements, then so too must his past or future persecution claim fail. See id.

**B. Asylum Claim**

We consider Petitioners' arguments concerning asylum. In so doing, we cabin our review to whether the Agency conclusion they had not demonstrated past persecution or a well-founded fear of future persecution was supported by substantial evidence.

**i. Past Persecution**

Part of Petitioners' past persecution burden was to prove that Urias-Orellana suffered "a certain level of serious

harm." Gonzalez-Arevalo, 112 F.4th at 8 (quoting Barnica-Lopez, 59 F.4th at 527). Persecution transcends "unpleasantness, harassment, and even basic suffering." Santos Garcia, 67 F.4th at 461 (quoting Nelson v. INS, 232 F.3d 258, 263 (1st Cir. 2000)). While "'[c]redible, specific threats can amount to persecution if they are severe enough' -- particularly if they are death threats," Montoya-Lopez v. Garland, 80 F.4th 71, 80 (1st Cir. 2023) (quoting Aguilar-Escoto v. Garland, 59 F.4th 510, 516 (1st Cir. 2023)) -- to qualify as past persecution, these threats must be "so menacing as to cause significant actual suffering or harm," Santos Garcia, 67 F.4th at 461 (quoting Lobo v. Holder, 684 F.3d 11, 18 (1st Cir. 2012)).

Petitioners argue that the record compelled a finding that the threats and assault experienced by Urias-Orellana met this burden. They emphasize that Urias-Orellana's assailants were armed, assaulted him on one occasion, and promised to leave him like his half-brothers if he did not comply.

Unfulfilled death threats rarely prove past persecution unless they are "so menacing as to cause significant actual suffering or harm." Id. The Agency reasonably concluded that the threats experienced by Urias-Orellana do not meet that threshold. As an initial matter, Urias-Orellana did not testify "about the 'immediate impact, if any, that these threats had on him,'" so we cannot say that the record compels a conclusion that they caused

significant actual suffering or harm. Id. (quoting Rodriguez v. Lynch, 654 F. App'x 498, 500 (1st Cir. 2016)). Here, "there [was] no finding that [] threats [against the petitioner] were 'credible' threats of death as opposed to threats intended to frighten him into paying, especially given the lack of severity of the one assault." Vargas-Salazar v. Garland, 119 F.4th 167, 173 (1st Cir. 2024) (alterations in original) (quoting Santos Garcia, 67 F.4th at 461. Indeed, the Agency considered how, over a four-year period, Urias-Orellana was threatened only three times by unknown assailants who demanded money and, on one occasion, struck him in the chest, three times -- an attack that did not result in hospitalization. That the assault "did not require hospitalization bears on the 'nature and extent' of [a petitioner's] injuries and is certainly 'relevant to the ultimate determination'" of persecution. Jinan Chen v. Lynch, 814 F.3d 40, 46 (1st Cir. 2016) (quoting Vasili v. Holder, 732 F.3d 83, 89 (1st Cir. 2013)).

Because this sequence of events did not involve threats or actions "so menacing as to cause significant actual suffering," Santos Garcia, 67 F.4th at 461, substantial evidence supports the Agency's no-past-persecution finding.

Petitioners highlight the assailants' striking the chest of Urias-Orellana and the assailants' mentioning of Juan and Remberto's fates as proof that they could make good on their

threats. But these circumstances do not present a case distinct from our precedents. Previously, we have upheld Agency decisions concluding that nearly identical -- or even more egregious -- circumstances did not rise to the level of persecution. Vargas-Salazar, 119 F.4th at 172-73 (concluding that multiple extortionate death threats and an injury that did not require hospitalization did not compel a finding of past persecution); Santos Garcia, 67 F.4th at 459-61 (three extortionate threats and a beating by armed assailants did not constitute persecution); Jinan Chen, 814 F.3d at 42-43 (upholding the Agency's no-persecution finding when the petitioner "was beaten and subsequently taken to the police station where he was placed in custody, interrogated, further assaulted, and threatened with forced sterilization"); Cabas v. Holder, 695 F.3d 169, 174 (1st Cir. 2012) (upholding no-persecution finding where the petitioner was kidnapped, beaten, and left unconscious and received threats after a break-in at his parents' home); Bocova v. Gonzales, 412 F.3d 257, 263 (1st Cir. 2005) (upholding no-persecution finding based on two death threats and a beating that left the petitioner unconscious and hospitalized). It follows that the record here did not compel a finding of past persecution.

**ii. Well-Founded Fear of Future Persecution**

Because Petitioners did not establish past persecution, they are not entitled to a presumption of future persecution.

Santos Garcia, 67 F.4th at 462. The Agency ruled that Petitioners did not establish future persecution, finding that they had no reasonable fear of future persecution on the basis that they could internally relocate. We thus examine the merits of that conclusion.

Even if a petitioner proves that "[he has] suffered past persecution or [has] a well-founded fear of future persecution, [the] application for asylum will be denied if the adjudicator determines that [he] could avoid persecution by internally relocating within the country of removal and, under all the circumstances, it would be reasonable to do so." Caz v. Garland, 84 F.4th 22, 27 (1st Cir. 2023). For a petitioner "to be able to internally relocate safely, there must be an area of the country where he or she has no well-founded fear of persecution." Matter of M-Z-M-R-, 26 I. & N. Dec. 28, 33 (B.I.A. 2012). To determine this, the Agency considers "the totality of the relevant circumstances" for relocation, such as "the size of the country of nationality or last habitual residence, the geographic locus of the alleged persecution, the size, numerosity, and reach of the alleged persecutor, and the [petitioner's] demonstrated ability to relocate to the United States in order to apply for asylum." 8 C.F.R. § 208.13(b)(3). Other relevant factors to the analysis include whether the petitioner previously had success relocating internally and his family's "continued safe residence . . . in the

country of removal." Caz, 84 F.4th at 28. After all, a petitioner's unimpeded movement "demonstrates that [he] can relocate safely," Chen Qin v. Lynch, 833 F.3d 40, 45 (1st Cir. 2016), and that "close relatives continue to live peacefully in the [petitioner's] homeland undercuts the [petitioner's] claim that persecution awaits his return," López-Pérez, 26 F.4th at 112 (quoting Aguilar-Solis v. INS, 168 F.3d 565, 573 (1st Cir. 1999)). Because Petitioners have not shown past persecution, they bear the burden "to establish that relocation would be unreasonable." Camara v. Holder, 725 F.3d 11, 15 n.3 (1st Cir. 2013).

Substantial evidence supports the Agency's conclusion that internal relocation in El Salvador would be reasonable. Urias-Orellana testified that he avoided harm, harassment, and threats twice successfully: first by moving to Cojutepeque and staying for one year, and then by moving to Cara Sucia and staying there for two and a half years. See Chen Qin, 833 F.3d at 45 (considering the petitioner's successful internal relocation to a relative's house). Likewise, as he has admitted, Urias-Orellana's relatives live throughout El Salvador undisturbed. See, e.g., López-Pérez, 26 F.4th at 112 (considering that the petitioner's sister and cousin still resided in Guatemala without being persecuted). Evidence of "prior successful internal relocation and the continued safe residence of [Petitioners'] family members in" El Salvador supports the Agency's conclusion. Caz, 84 F.4th

at 28 (first citing López-Pérez, 26 F.4th at 112; and then citing Chen Qin, 833 F.3d at 45).

Petitioners contend that Urias-Orellana did not internally relocate with success because, upon returning to Claudia Lara, he was confronted by the men who threatened him. They also note that El Salvador has a high per-capita murder rate; is full of criminal gangs dispersed throughout the country; and is so small as to make it impossible to avoid Wilfredo.

Petitioners' complaints falter against the substantial evidence standard. As we have stated, we do not consider whether the record contains any evidence suggesting that relocation might not be reasonable -- only "whether a reasonable factfinder, having considered all the evidence, would be compelled to conclude that [Urias-Orellana] could not safely relocate within" El Salvador. Id. at 29. A reasonable factfinder would not be so compelled here. Urias-Orellana was able to live in towns across El Salvador for years without harassment and only encountered difficulties once he returned to his hometown. And his relatives -- members of his family who Wilfredo would presumably also want dead -- have lived across El Salvador unscathed. Therefore, substantial evidence supports the Agency's conclusion that Urias-Orellana did not establish that relocation was unreasonable.

**C. CAT Claim**

To succeed on his CAT claim, Urias-Orellana "must show that 'it is more likely than not that he will be tortured if returned to his home country.'" Lafortune v. Garland, 110 F.4th 426, 438 (1st Cir. 2024) (quoting Bonnet v. Garland, 20 F.4th 80, 84 (1st Cir. 2021)). In doing so, he must show that "he would be subject to torture 'by or with the acquiescence of a government official.'" Perez-Trujillo v. Garland, 3 F.4th 10, 18 (1st Cir. 2021) (quoting Aldana-Ramos v. Holder, 757 F.3d 9, 19 (1st Cir. 2014)). "Acquiescence" requires that a "public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7).

Urias-Orellana argues that the record compels the conclusion that the Salvadoran government lacked the resources to protect him from torture at the hands of criminal gangs. He stresses that the 2020 country conditions report demonstrates corruption in the judicial system and government, along with impunity for those officials, undermining the rule of law. In turn, he contends that this led to the government's inability to halt gangs.

Urias-Orellana's argument fails, as the Agency held, for a fundamental reason: The 2020 country conditions report does not "supplant the need for particularized evidence." Amouri v. Holder,

572 F.3d 29, 35 (1st Cir. 2009) (noting that country conditions reports "do not necessarily override petitioner-specific facts"). He is "oblig[ated] to point to specific evidence indicating that he, personally, faces a risk of torture." Alvizures-Gomes v. Lynch, 830 F.3d 49, 55 (1st Cir. 2016).

That he does not do. Urias-Orellana never even attempted to report his harassment, which did not rise to the level of persecution and certainly not torture, to the police. He only speculates here -- as he did before the Agency -- about its inability to protect him. See, e.g., Ramírez Pérez v. Barr, 934 F.3d 47, 52 (1st Cir. 2019) (rejecting petitioner's argument of government acquiescence where he never attempted to report his mistreatment to the police); Gomez-Abrego, 26 F.4th at 46 (rejecting petitioner's arguments where she only pointed to "her belief that the police were 'in cahoots' with gang members and [a] country report showing widespread violence and police corruption in El Salvador," and the Agency properly considered and rejected this as evidence of acquiescence to torture).

And "even where 'efforts at managing gang activity [are not] completely effectual,' that is insufficient to sustain a CAT claim unless the record 'compel[s] a conclusion that the government has acquiesced in gang activities.'" Perez-Trujillo, 3 F.4th at 20 (alteration in original) (quoting Mayorga-Vidal v. Holder, 675 F.3d 9, 20 (1st Cir. 2012)). The record does not compel such a

conclusion. The IJ explicitly considered the 2020 country conditions report, and noted that report described how the Salvadoran police's investigative units "have shown great promise" in managing gangs. See id. at 20-21 (holding that substantial evidence supported the Agency's no-acquiescence finding where country conditions evidence stated, in part, that the Salvadoran police had made efforts to crack down on gang violence); Mayorga-Vidal, 675 F.3d at 20 (holding similarly).

## III. CONCLUSION

For these reasons, we **deny** the petition for judicial review.